# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**Margaret Meier,**

        **Plaintiff,**

**v.**                                            **Case No. 18-cv-2368-JWL**

**Shawnee Mission Medical Center, Inc.,**

        **Defendant.**

## MEMORANDUM & ORDER

Plaintiff Margaret Meier filed this lawsuit against her former employer alleging sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Specifically, she alleges that defendant discriminated against her on the basis of sex with respect to her compensation and bonus and in terminating her employment and that defendant negatively impacted her compensation and terminated her employment in retaliation for her complaints about sex discrimination. This matter is presently before the court on defendant's motion for summary judgment on all claims (doc. 71). As will be explained, the motion is granted in its entirety.[1]


## I.    Facts

The following facts are uncontroverted, stipulated in the pretrial order, or related in the light most favorable to plaintiff as the non-moving party. Defendant Shawnee Mission Medical

---

[1] The court previously dismissed plaintiff's state law retaliatory discharge claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

Center, Inc. operates a hospital in Johnson County, Kansas. In April 2015, defendant hired plaintiff Margaret Meier as the Administrative Director of Women's and Children's Services. In this role, she was also responsible for defendant's Birth Center. The Birth Center is a premier facility in the Kansas City market and, according to Ken Bacon, defendant's Chief Executive Officer, it is imperative for its effective and successful operation that the hospital has a strong leader in place who has the trust and confidence of his or her management team, the hospital's leadership team and the physicians who practice at the hospital.

Plaintiff supervised numerous departments, or "cost centers," in the hospital: Labor & Delivery; Mother-Baby; Well-Baby Nursery; Neonatal Intensive Care Unit (NICU); Maternal Fetal Specialist Clinic; Parent Education & Lactation Services; OB Hospitalists; Women & Children Administration; and the Infant Development Center. Through her employment, plaintiff's immediate supervisor was Sheri Hawkins, Vice President and Chief Nursing Officer. At all times pertinent to this lawsuit, plaintiff's second-line supervisor (and Ms. Hawkins' direct supervisor) was Michael Knecht, a Senior Vice President and defendant's Chief Operating Officer. As noted earlier, Ken Bacon was the defendant's Chief Executive Officer. In her role as the Administrative Director of Women's and Children's Services, plaintiff had several direct reports—the managers of each of the departments under plaintiff's supervision. Eva Shay, for example, was the manager of the Mother-Baby department. Amy Milroy was the manager of the Infant Development Center. Sonya Corwine was the Maternal Fetal Specialist Clinic manager. Roughly 500 employees reported to plaintiff through her managers and virtually all of those employees were female.

Every "cost center" at the hospital has a defined "Unit of Service" that helps the hospital measure productivity. In the emergency room, for example, the unit of service is "visits." Each department also has a budgeted number of labor hours, which are typically measured per unit of service. Comparing the amount of actual labor hours used in a cost center over a period of time versus the budgeted labor hours per unit of service provides the productivity metric. Periodically, the hospital published productivity reports that reflected each cost center's actual labor hours used relative to their budgeted labor hours per unit of service. If a cost center has used fewer labor hours than the budgeted hours per unit of service, then that cost center is "in the green." If a cost center has used more labor hours than the budgeted hours per unit of service, then that cost center is "in the red." Every two weeks, Mr. Knecht studied the most recent productivity report and then had 4 to 6 managers come to his office each month to talk about areas of concerns. Mr. Knecht described these meetings as "accountability meetings" where there was no time for "pleasantries." According to Mr. Knecht, it was necessary to "dig right into the material and get through it. . . . I have to hold people accountable, and we have to get the information quickly to have an understanding of do the managers have a sense of why they're off or not. That's what I care about." Plaintiff agreed that the "productivity meetings" with Mr. Knecht were "all business" and "direct questioning." It is undisputed that plaintiff's cost centers were "in the red" for most of her employment with defendant. Plaintiff contends that productivity in the Birth Center "looked great" before she was hired because the hospital was not utilizing sufficient staff to care for the patients it had.

In August 2015, defendant's Chief Financial Officer Karsten Randolph had a productivity meeting with plaintiff, Ms. Hawkins, Mr. Knecht and all of plaintiff's direct reports. During that

meeting, Mr. Randolph questioned plaintiff's NICU manager Cathy Grenz about productivity. When Ms. Grenz struggled to answer, plaintiff "jumped in" and told Mr. Randolph that "the productivity and how it's set up for the NICU at Shawnee Mission was not appropriate and that it really needed to be looked at." According to plaintiff, Mr. Randolph then asked her "in a very rude and derogatory way" whether she had ever worked with Premier Benchmarking and then told her managers "Your boss is going to get a quick lesson on productivity." Later, plaintiff told Ms. Hawkins that she had "never been spoken to" the way that Mr. Randolph spoke to her in the meeting, which she described as "very intimidating and very hostile." Plaintiff testified that she was "horrified" by Mr. Randolph's treatment of her and questioned her decision to accept a position at the hospital. She was also surprised that Ms. Hawkins did not speak up during the meeting to support her.

At some point in 2016, the hospital hired Premier to provide benchmarking data across the hospital's cost centers for purposes of attempting to increase productivity and lower costs. Premier is a private company that collects data and then provides staffing recommendations for hospital departments based on what Premier believes are comparable hospitals from around the country. Premier uses information gathered about a hospital's department and compares that information to similar departments at other hospitals to provide staffing recommendations. Toward that end, plaintiff and her managers completed questionnaires from Premier about their cost centers. Plaintiff also submitted additional information to Premier, through defendant's Vice President of Finance, because she believed that the Birth Center had certain "nuances" that set it apart from other labor and delivery departments in other hospitals. Over time, plaintiff was involved in various discussions with Premier representatives. Many of these discussions focused

on plaintiff's efforts to demonstrate to those representatives that "the people they were benchmarking us against were not accurate and demonstrating the ways it was not accurate." Ultimately, the hospital's finance team adopted various recommendations made by Premier and, according to plaintiff, those staffing levels negatively impacted the productivity in plaintiff's cost centers as measured by defendant's productivity metric.

The record reflects that plaintiff and Mr. Knecht had several "productivity meetings" in 2016. While the details of those meetings are not pertinent, it is undisputed that Mr. Knecht was increasingly frustrated with the Birth Center's productivity numbers under plaintiff's leadership and plaintiff was increasingly frustrated with what she perceived as Mr. Knecht's refusal to listen to or remember her ideas about how to increase productivity in the Birth Center. Plaintiff frequently vented her frustrations to Ms. Hawkins via email. Those emails are described in more detail below as necessary.

In addition to having concerns about plaintiff's fiscal leadership, defendant began having concerns about the relationship between plaintiff and her management team in June 2016. At that time, both Mr. Knecht and Ms. Hawkins became aware that at least one member of plaintiff's management team, Sonya Corwine, had lodged complaints with the hospital about plaintiff's management style and, more specifically, that members of plaintiff's team feared retribution from plaintiff if they disagreed with or challenged her. Plaintiff's evidence reflects that Ms. Corwine, for whatever reason, openly sought to undermine plaintiff's leadership at every turn and that Ms. Corwine herself was on the verge of termination due to disciplinary and performance issues. Regardless, plaintiff concedes that there were "issues with trust" between herself and certain female managers on her team in light of Ms. Corwine's and Eva Shay's efforts to undermine her

authority.  By late September 2016, Ms. Corwine and Ms. Shay had filed a formal complaint against plaintiff with defendant's human resources department.  Employee Relations Specialist Keith Thomas was assigned to review and investigate the complaint.  Human Resources Director Lana Deason and her assistant Rachel Ross notified Mr. Knecht that certain managers under plaintiff's supervision had filed a complaint and that an investigation into that complaint had been initiated.  During the course of that investigation, plaintiff was not interviewed and the record does not reflect any formal findings or conclusion arising out of Mr. Thomas's investigation.

At some point, Mr. Knecht had an in-person meeting with Ms. Corwine about her complaint.  Ms. Corwine gave Mr. Knecht the impression that plaintiff was "micromanaging" her managers, had fostered a feeling of distrust among her managers and that the managers feared retaliation if they spoke up against plaintiff.  Mr. Knecht testified that Ms. Corwine's perception was that plaintiff was "spying" on her managers and did not trust them.  Mr. Knecht did not ask for plaintiff's side of the story after meeting with Ms. Corwine.  After Ms. Corwine's and Ms. Shay's complaint, other members of plaintiff's team came forward to complain about plaintiff's leadership and management style, including Raimonda King, the manager of the Mother-Baby unit, and plaintiff's administrative assistant, Arlene Hagensicker.  Plaintiff highlights that Ms. King was "easily influenced" and that her administrative assistant had been counseled for rude behavior in the past.  She also highlights that other female managers did not make complaints about her and enjoyed working with her.  Mr. Knecht testified, however, that he had a "growing concern" about plaintiff's leadership and that it was "highly unusual" for a person at plaintiff's level to have several managers lodge a formal complaint against their boss. Mr. Knecht testified that based on the reports he received from human resources and directly from some of plaintiff's

managers, he came to believe that plaintiff did not create a culture of openness and trust among her managers. The record reflects that Mr. Knecht shared with Mr. Bacon (during their monthly one-on-one meetings) the nature of the complaints coming from certain managers about plaintiff's leadership and management style. Mr. Bacon was also aware that plaintiff's cost centers were not meeting their productivity expectations and had not been for some time. Plaintiff reiterates that Mr. Knecht never sought her input on these issues and never interviewed female managers who enjoyed working with plaintiff, such as Amy Milroy.

In December 2016, two physicians, one male and one female, pulled Mr. Knecht and Mr. Bacon aside after a physicians' meeting and told them that the Birth Center was no longer a "collegial environment" and that, unlike in years past when they were invited to meet regularly with the director, the physicians in the Birth Center were not involved in decisions or operations of the Birth Center but were simply told what to do. Mr. Bacon further avers that a female pediatrician (who was also the Medical Staff President) shared her concerns that plaintiff treated her staff poorly, did not foster a collaborative working environment, did not interact well if at all with some of the physicians and did not seem to have a strong handle on the management of the Birth Center. While plaintiff does not dispute these facts,[2] she emphasizes that obstetricians practicing in the Birth Center complained to her about nursing staff shortages in the Birth Center and the resulting patient safety concerns. These concerns were passed on to Ms. Hawkins and

---

[2] Plaintiff suggests that one of the female physicians who allegedly complained to Mr. Bacon about plaintiff could not have complained because that physician was "saddened" and "speechless" when she learned about plaintiff's termination. Even assuming the truth of that statement, it does not controvert Mr. Bacon's statement that the physician raised concerns with him about the Birth Center and the environment there under plaintiff's leadership.

Mr. Bacon but no additional nursing hours were budgeted for the Birth Center. She also asserts that she was never notified of any physicians' complaints about her.

The record reflects that Mr. Bacon, after receiving complaints from physicians about plaintiff's leadership and management style, was ready to terminate her employment and discussed that issue with Mr. Knecht. Defendant asserts that Mr. Knecht asked Mr. Bacon for "more time, at least three months" to try to "get things turned around" and move forward with plaintiff in that leadership role.[3] On January 26, 2017, plaintiff inadvertently forwarded to five of her managers an email attachment that contained the salary and earnings information for her managers and others on her team. When Mr. Bacon learned this in early February 2017, he sent an email to Mr. Knecht and Ms. Hawkins indicating that it was time to terminate plaintiff's employment and that the hospital could not wait any longer. Mr. Knecht and Ms. Hawkins then conferred and prepared to terminate plaintiff's employment. On February 20, 2017, Ms. Hawkins advised plaintiff that her employment was terminated. Plaintiff testified that Ms. Hawkins told plaintiff that Mr. Knecht wanted her to "make sure and let you know that you're being let go because you created a hostile work environment with your team" and because "there was mistrust or distrust" on plaintiff's team.

After plaintiff's employment was terminated, Mr. Bacon instructed Mr. Knecht that he wanted to be heavily involved in finding her replacement. Mr. Bacon told Mr. Knecht that finding

---

[3] Plaintiff purports to controvert this statement by stating that Monica Powers, defendant's Assistant Chief Nursing Officer, told her that Sheri Hawkins told her that Mr. Knecht was "never going to let [plaintiff] be successful." To support that statement, plaintiff relies on a written chronology of events that she maintained contemporaneously during and after her employment. The entry about her phone conversation with Ms. Powers in which Ms. Powers allegedly told her about a conversation with Ms. Hawkins is hearsay and inadmissible.

the right candidate to replace plaintiff was extremely important, and that Mr. Knecht and Ms. Hawkins needed to find someone who had the leadership, communication, team-building and collaborative qualities needed to succeed in the position. When no suitable candidate emerged immediately, Mr. Knecht and Ms. Hawkins selected Marsha Lisk, a female, as Interim Director. Ultimately, Mr. Knecht and Ms. Hawkins selected Raimonda King, the female manager of the Mother-Baby department during plaintiff's employment, as the permanent Administrative Director of Women's and Children's Services in February 2018. It is undisputed that Mr. Bacon agreed with and supported both hiring decisions.

## II.    Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, other discovery materials, and affidavits demonstrate the absence of a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Water Pik, Inc. v. Med–Systems, Inc*., 726 F.3d 1136, 1143 (10th Cir. 2013) (quotation omitted); *see* Fed. R. Civ. P. 56(a). A factual issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Water Pik, Inc*., 726 F.3d at 1143 (quotation omitted). "The nonmoving party is entitled to all reasonable inferences from the record; but if the nonmovant bears the burden of persuasion on a claim at trial, summary judgment may be warranted if the movant points out a lack of evidence to support an essential element of that claim and the nonmovant cannot identify specific facts that would create a genuine issue." *Id*. at 1143-44.

## III.    Sex-Based Compensation Discrimination

In the pretrial order, plaintiff contends that defendant discriminated against her based on sex with respect to compensation and bonuses.  Plaintiff clarifies in her response to the motion for summary judgment that she is not challenging her base pay.  With respect to her 2016 Incentive Bonus, she contends that defendant's facially neutral bonus structure has a disparate impact on women.  Plaintiff expressly relies on *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971) in support of her argument.  This distinct theory of liability does not appear in the pretrial order and has been waived.  *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (claims or theories not included in the pretrial order are waived).

## IV.    Sex-Based Discriminatory Discharge

In the pretrial order, plaintiff contends that defendant terminated her employment based on her sex in violation of Title VII. As plaintiff has no direct evidence of discrimination, her claim is analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Under *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of discrimination.  *Id.*   While the Circuit does not rigidly require certain prima facie elements, plaintiff must generally establish "(1) membership in a protected class and (2) an adverse employment action (3) that took place under circumstances giving rise to an inference of discrimination." *Id.* (citing *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007)).  If she establishes a prima facie case, the burden shifts to defendant to assert a legitimate, nondiscriminatory reason for the adverse employment action.  *Id.* If defendant meets this burden,

summary judgment against plaintiff is warranted unless she introduces evidence "that the stated nondiscriminatory reason is merely a pretext for discriminatory intent." *Id*. (citing *Simmons v. Sykes Enters*., 647 F.3d 943, 947 (10th Cir. 2011)).

As an initial matter, defendant asserts that plaintiff cannot establish a prima facie case of discrimination because she cannot show that she was treated less favorably than similarly situated male employees; because she was replaced by a female; and because she does not assert that the "ultimate" decisionmaker, Ken Bacon, bore any discriminatory animus toward her. Plaintiff urges that the evidence on these issues should be analyzed at the pretext stage and the court agrees. The Tenth Circuit recently stated that a plaintiff sets forth a prima facie case of discriminatory discharge based on sex by showing that she was qualified for the job; she was terminated; and the job was not eliminated. *See Fassbender v. Correct Care Solutions*, *LLC*, 890 F.3d 875, 884 (10th Cir 2018) (explaining that the purpose of the first step is to exclude "the two most common, legitimate reasons for termination, *i.e*., lack of qualification or the elimination of the job").

Having rejected defendant's argument concerning plaintiff's prima facie case, the court turns to whether defendant has met its burden to articulate a legitimate, nondiscriminatory reason for plaintiff's discharge. "This burden is one of production, not persuasion; it can involve no credibility assessment." *Carter v. Pathfinder Energy Servs., Inc*., 662 F.3d 1134, 1149 (10th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 142 (2000)). The Tenth Circuit has characterized this burden as "exceedingly light," and the court finds that defendant has carried it here. *See id*. According to defendant, plaintiff's employment was terminated by Mr. Bacon after he lost confidence in her ability to lead the Birth Center. Defendant highlights that Mr. Bacon learned that many of plaintiff's managers had complained that plaintiff created a

culture of mistrust and micromanagement; he received complaints from physicians about the working environment in the Birth Center since plaintiff was hired as the Director; and he had concerns about plaintiff's fiscal leadership given that the Birth Center was "in the red" since plaintiff was hired as the Director. Finally, defendant relies on the fact that plaintiff sent an email to her management team disclosing the salaries of other managers and nurses. The burden of proof, then, shifts back to plaintiff to show that defendant's proffered reasons are pretextual.

Evidence of pretext "may take a variety of forms," including evidence tending to show "that the defendant's stated reason for the adverse employment action was false" and evidence tending to show "that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances." *Id*. at 1150 (quoting *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1230 (10th Cir. 2000)). A plaintiff may also show pretext with evidence that the defendant had "shifted rationales" or that it had treated similarly situated employees differently. *Crowe v. ADT Servs., Inc*., 649 F.3d 1189, 1197 (10th Cir. 2011). In essence, a plaintiff shows pretext by presenting evidence of "weakness, implausibility, inconsistency, incoherency, or contradiction in the employer's stated reasons, such that a reasonable jury could find them unconvincing." *Debord v. Mercy Health System of Kansas, Inc*., 737 F.3d 642, 655 (10th Cir. 2013). In determining whether the proffered reason is pretextual, the court examines "the facts as they appear to the person making the decision, not as they appear to the plaintiff." *Id*. The court does not "ask whether the employer's proffered reasons were wise, fair or correct" but only whether "the employer honestly believed those reasons and acted in good faith upon those beliefs." *Id*.

In an effort to establish pretext, plaintiff first contends that male executives on the administrative and finance teams disfavored her aggressive leadership style as "unladylike" and that those male executives dismissed her ideas and input based on the fact that she is a female who did not conform "to particular gender norms or cultural expectations." This argument fails for two reasons. First, it appears that plaintiff, at this late stage and for the first time, is asserting a separate legal theory of sex discrimination—that she was discriminated against for failing to conform to sex stereotypes. *See Etsitty v. Utah Transit Authority,* 502 F.3d 1215 (10th Cir. 2007) (describing "*Price Waterhouse* theory of gender stereotyping" as distinct from sex discrimination claim); *Essary v. Federal Express Corp.*, 161 Fed. Appx. 782, 785 (10th Cir. Jan. 6, 2006) (suggesting that "sex sterotyping" discrimination is separate and distinct from gender discrimination). As urged by defendant, this theory does not appear in the pretrial order and has been waived. *See Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (claims, issues, defenses or theories of damages not included in the pretrial order are waived).

Second, even if construed as evidence of pretext to support an intentional discrimination claim, there is simply no factual support in the record. Certainly, there is no evidence that any male executive ever described plaintiff as "unladylike" or "aggressive." While she highlights that Mr. Knecht testified that plaintiff was "confident" and "not afraid to speak her mind," her argument that such testimony reflects that he dismissed her ideas based on her sex is sheer speculation which, of course, cannot support a finding of pretext. *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1237–38 (10th Cir. 2015) (affirming summary judgment against plaintiff's Title VII retaliation claim because plaintiff "merely advanced speculative theories" that failed to demonstrate pretext). Plaintiff also suggests that a "Boys Club" atmosphere existed at the hospital

13

on the executive and finance teams. It is uncontroverted that only female employees ever used this phrase and, according to plaintiff, it was only used to express frustration when male members of those teams golfed together without inviting female managers. But plaintiff's evidence as to male-only golf outings is weak. On at least some occasions, the medical staff extended golfing invitations—not the executive or finance teams. Moreover, the record contains evidence that mixed-sex golf and other social outings occurred and that all-female social outings occurred. More importantly, plaintiff does not contend that she desired to participate in any golf outings; that she was denied the opportunity to participate in those outings; or that those golf outings had any connection to the decision to terminate plaintiff's employment. *See Eke v. CaridianBCT, Inc.*, 490 Fed. Appx. 156, 167-68 (10th Cir. July 31, 2012) (allegation that male supervisor maintained "good-old-boys club" and lacked same camaraderie with female employees that he enjoyed with male employees insufficient to establish pretext where plaintiff did not connect any specific example of alleged discrimination to decision to eliminate job).

Plaintiff also contends that, in fact, she was a good manager but she was undermined by some of her subordinates who did not like it when she held them accountable. Essentially, plaintiff asserts that defendant "got it wrong." But to prove pretext, plaintiff must produce evidence that defendant "did more than get it wrong." *Johnson v. Weld County*, 594 F.3d 1202, 1211 (10th Cir. 2010). She must show that defendant did not actually believe its proffered reasons for terminating her employment. *See id.* Plaintiff has come forward with no evidence suggesting that defendant did not honestly believe that plaintiff had created an atmosphere of distrust on her team and that it had lost confidence in her ability to lead that team. And despite plaintiff's insistence that she was a good manager, her perception of her performance is not relevant to the pretext analysis.

*Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101, 1107 (10th Cir. 2008) (it is the manager's perception of the employee's performance that is relevant, not the plaintiff's subjective evaluation of his own relative performance).

Plaintiff next argues that pretext is demonstrated by the fact that defendant relied on the results of Keith Thomas's "sham investigation" to support the termination decision. According to plaintiff, Mr. Thomas never even interviewed her or Ms. Hawkins and several internal e-mails between Mr. Thomas and other employees reflect that the investigation was one-sided and that Mr. Thomas was incompetent.[4] This argument fails for several reasons. It is unconverted that Mr. Thomas's investigation was initiated by plaintiff's direct reports, who requested a meeting with an Employee Relations Specialist in September 2016 to raise concerns about plaintiff's

---

[4] To the extent plaintiff attempts to establish pretext solely because Mr. Thomas never asked her for her "side of the story," that argument is rejected. Plaintiff does not suggest that defendant violated any internal policy when it failed to interview her prior to terminating her employment. Rather, plaintiff contends only that the Tenth Circuit has suggested that a failure to obtain an employee's version of events prior to termination may support an inference of pretext. But the single case relied upon by plaintiff—and every other Circuit case that supports that statement— arose in the context of assessing the "cat's paw" theory of liability wherein a plaintiff seeks to establish pretext by presenting evidence that a biased subordinate who lacked decision-making authority used the formal decision-maker as a dupe in a deliberate scheme to bring about an adverse employment action. *See, e.g.*, *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 515-17 (10th Cir. 2015) (citing cases); *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 542-43 (10th Cir. 2014). In those cases, the Circuit has recognized that an employer can establish that the employer was not tainted by the biased subordinate if it conducted an independent investigation of the subordinate's decision. *See Thomas*, 803 F.3d at 516-17. And one way in which an employer might accomplish that independent investigation is by giving the employee an opportunity to share his or her side of the story. *Id.* at 517 (an employer's request that the employee give her side of the story is sufficient to defeat any inference that the decision was based on a subordinate's bias). The Circuit has never held or suggested outside that specific context (a context that is not implicated in this case as there are no allegedly biased subordinates on which the decisionmakers relied) that an employer's failure to interview an employee, standing alone, is sufficient to establish pretext.

"aggressive management tactics, behaviors and retaliatory actions" in leading the Birth Center. The investigation was not directed by or initiated by Mr. Knecht or Mr. Bacon and neither one of them ever advised Mr. Thomas about which employees he should or should not interview. *Compare Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 542-43 (10th Cir. 2014) (pretext shown from unfair investigation where decision makers deliberately prevented plaintiff from telling his side of the story and then purposefully rendered termination decision based on one-sided information). Moreover, it is undisputed that neither Mr. Knecht nor Mr. Bacon ever saw Mr. Thomas's internal emails that plaintiff relies upon so heavily in challenging the investigation. Rather, at the time of the termination decision, Mr. Knecht had only been given "summary" updates on the investigation from Ms. Deason and Ms. Ross in the Human Resources department, including the nature of complaints received by plaintiff's direct reports. Plaintiff does not suggest that Mr. Knecht had reason to doubt the accuracy of the updates he received from them.[5] Finally, while plaintiff asserts that defendant "relied" on Mr. Thomas's investigation in explaining its termination decision to the EEOC, defendant only references Mr. Thomas's investigation in its position statement to show that plaintiff's direct reports raised significant concerns about plaintiff's leadership style. The position statement does not identify Mr. Thomas's investigation as a basis for the decision to terminate plaintiff's employment. And in any event, it is undisputed that physicians and plaintiff's direct reports, outside the context of Mr. Thomas's investigation, complained directly to Mr. Bacon and Mr. Knecht about plaintiff's leadership and management style. Thus, regardless of whether internal e-mails might demonstrate that the investigation was

---

[5] Plaintiff provides no evidence that Mr. Bacon, at the time of the termination decision, had knowledge of Mr. Thomas's findings or summary of the investigation.

one-sided or that Mr. Thomas was an "incompetent" investigator, no reasonable jury could find that those facts establish pretext because there is no evidence that Mr. Bacon or Mr. Knecht relied on those emails or even relied on Mr. Thomas's findings in terminating plaintiff's employment. Mr. Thomas's investigation, thus, does not create a triable issue that defendant's proffered reasons for terminating plaintiff's employment were false.

Lastly, plaintiff asserts that she can establish pretext because defendant's stated reasons for terminating her employment have changed over time and are inconsistent. Viewing the evidence in the light most favorable to plaintiff, the record does not support that conclusion. In February 2017, Ms. Hawkins told plaintiff that Mr. Knecht wanted her to know that she was being terminated because plaintiff had created a hostile work environment on her team and had fostered an atmosphere of mistrust among her team. Mr. Knecht testified in this lawsuit that plaintiff was terminated based on defendant's lack of confidence in her leadership and based on her performance. Plaintiff has not explained how Mr. Knecht's testimony conflicts with what he told Ms. Hawkins in February 2017. On both occasions, he relied on plaintiff's leadership abilities which necessarily would include performance-related concerns. In connection with plaintiff's claim for unemployment benefits, defendant filled out paperwork identifying the reasons for plaintiff's discharge as "not qualified" and "unsatisfactory work performance." These forms, however, do not invite more detailed explanations underlying the termination decision and cannot reasonably be construed as inconsistent with defendant's initial reason—loss of confidence in plaintiff's leadership abilities. Plaintiff also highlights defendant's position statement to the EEOC, in which defendant asserted that plaintiff was terminated because defendant had lost confidence in her abilities for several reasons, including her failure to meet overall productivity

17

standards, complaints about her leadership style which negatively impacted the work environment of her team, and the fact that she had disclosed the private salary information of her staff to supervisors on the team. While the position statement includes one new reason for plaintiff's termination (her disclosure of salary information), that additional reason is not inconsistent with defendant's prior reasons and, thus, does not prove pretext. *See Rolland v. Carnation Building Servs., Inc.*, 739 Fed. Appx. 920 (10th Cir. May 30, 2018) (reasons for termination that are merely additional but not contradictory do not necessarily suggest pretext). The majority of the reasons set forth by defendant in its position statement are entirely consistent with the reason Mr. Knecht initially provided for plaintiff's termination—defendant's loss of confidence in her leadership abilities—or simply elaborate on that initial reason. *See Matthews v. Euronet Worldwide, Inc.*, 271 Fed. Appx. 770, 773-74 (10th Cir. Mar. 28, 2008) (no support for a finding of pretext if the employer does not give inconsistent reasons but instead merely elaborates on the initial justification for termination). The same can be said with respect to defendant's interrogatory responses in which defendant indicated that plaintiff was terminated because she lost the confidence of the executive team and her staff; her failure to meet productivity goals; complaints about her management style; and her lack of judgment in disclosing salary information to managers on her team. In short, the various iterations of the reasons for defendant's decision are at most "minor variations on a central theme" from which no rational factfinder could base a finding of pretext. *See Hardy v. S.F. Phosphates Ltd. Co*., 185 F.3d 1076, 1081 (10th Cir. 1999).


**V.     Retaliation**

Plaintiff asserts in the pretrial order that defendant "negatively impacted her compensation" and terminated her employment in retaliation for her complaints about sex discrimination. The court assesses plaintiff's retaliation claims under the *McDonnell Douglas* framework. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 638 (10th Cir. 2012). To state a prima facie case for retaliation, plaintiff "must show (1) she engaged in protected opposition to discrimination, (2) a reasonable employee would have considered the challenged employment action materially adverse, and (3) a causal connection existed between the protected activity and the materially adverse action." *Id*. (quoting *Hinds v. Sprint/United Mgmt. Co*., 523 F.3d 1187, 1202 (10th Cir. 2008)). If plaintiff presents a prima facie case of retaliation, then defendant must respond with a legitimate, nonretaliatory reason for the challenged action. *Debord v. Mercy Health Sys. of Kansas, Inc*., 737 F.3d 642, 656 (10th Cir. 2013). Plaintiff, then, must show that defendant's stated reason is pretextual. *Id*.

In its motion for summary judgment, defendant contends that summary judgment is appropriate on plaintiff's retaliation claims because plaintiff cannot show that she engaged in protected opposition to discrimination; because she cannot establish a causal connection between any complaints and any adverse action; and because she cannot establish that defendant's proffered reasons for those actions are pretextual. Because the court concludes that no reasonable jury could conclude that plaintiff engaged in "opposition protected by Title VII" when she complained about Mr. Knecht's behavior, the court grants summary judgment in favor of defendant on the retaliation claims and declines to address the other issues raised in defendant's motion.

To establish the first prong of her prima facie case of retaliation, plaintiff must show that she conveyed to her employer a "concern that the employer has engaged in a practice made unlawful" by Title VII. *See Hinds v. Sprint/United Management Co*., 523 F.3d 1187, 1203 (10th Cir. 2008). ("Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful" by Title VII.). It is undisputed that plaintiff never expressly conveyed a concern that Mr. Knecht or any other management employee was discriminating against plaintiff based on her sex. Plaintiff, however, contends that she complained to Ms. Hawkins, Ms. Powers and Ms. Pollmiller that Mr. Knecht "would raise his voice and be visibly angry, was dismissive of information she provided, embarrassed her, would make accusations towards her and would not listen to or believe what she said."

To support her assertion that she engaged in protected activity, plaintiff submits three emails that she sent to Ms. Hawkins, dated March 25, 2016; October 21, 2016; and December 29, 2016. The subject line of the first email is "productivity discussion with Michael." In that email, plaintiff does not raise any concerns about Mr. Knecht or highlight anything unusual about her discussion with Mr. Knecht about productivity. No jury could find otherwise. Rather, plaintiff complains to Ms. Hawkins about a woman named "Andrea" who, according to plaintiff, manipulated the UOS (Unit of Service) data for the mother-baby unit which resulted in a significant increase in the number of productivity hours that the mother-baby unit was "in the red." In the email, plaintiff states "It feels like anytime she touches anything with productivity for the birth center, it gets worse, not better. She told me that she would reconfigure things but I do not believe that it will help that much." Because the primary focus of this email is a complaint

about another female, it cannot be reasonably inferred from the email that plaintiff was complaining to Ms. Hawkins about sex discrimination.

The October 21, 2016 email has a subject line of "Productivity meeting" and, in it, plaintiff expresses frustration about "pulling data" and giving "presentation after presentation" only to have her data "either not be reviewed or remembered." She specifically mentions that she provided a data sheet to Alan Gutyon, but that he "barely looked at it." The email is lengthy and detailed about the productivity meeting, but it contains no statement from which a jury could reasonably conclude that plaintiff was expressing a concern that Mr. Knecht or Mr. Guyton had treated her differently based on sex or otherwise discriminated against her based on sex. Plaintiff's general complaints about her supervisors failing to remember or perhaps appreciate her work efforts is not a complaint about sex discrimination. *See Boese v. Fort Hays State Univ*., 814 F.Supp.2d 1138, 1146 (D. Kan. 2011), *aff'd*, 462 Fed. Appx. 797 (10th Cir. 2012) (holding that complaints about working conditions that did not allege that the adverse conditions were based on sex is not protected activity under Title VII).

Finally, the December 29, 2016 email from plaintiff to Ms. Hawkins has a subject line of "oh boy." In this email, plaintiff complains primarily about Sonya Corwine, one of plaintiff's direct reports who managed the Maternal Fetal Specialist Clinic. She complains that Ms. Corwine made inaccurate statements during a department meeting; that Ms. Corwine was "stirring the pot" by going over her head to talk to the Chief Financial Officer directly about finance issues; and that Ms. Corwine "sounded suspicious" when she announced that she had to leave the department meeting early. She accuses Ms. Corwine of "lying" and attributes many of the problems on her team to Ms. Corwine's "undermining and lies." With respect to Mr. Knecht, she asserts that she

explained her feelings about Ms. Corwine to Mr. Knecht during a December 29 meeting with him, but Mr. Knecht accused her of micro-managing her team; failing to create a trusting environment with her team; and that plaintiff's management style was to blame for productivity concerns. She expressed concern that her explanations about Ms. Corwine did not make "one bit of difference" to Mr. Knecht and that he believed "a low performer who is an expert manipulator" over plaintiff. Plaintiff asserts that Mr. Knecht was "visibly angry" and "loud" during this meeting and that she was embarrassed because his office door was open. Again, because plaintiff was complaining to Ms. Hawkins about another female, no jury could conclude that Ms. Hawkins should have construed the complaint as one about sex discrimination. And despite plaintiff's specific complaints about Mr. Knecht, the evidence simply does not permit an inference that plaintiff ever suggested that Mr. Knecht was discriminating against her based on sex. *See Macias v. Southwest Cheese Co.*, 624 Fed. Appx. 628, 639-40 (10th Cir. Aug. 24, 2015) (plaintiff's complaint that supervisor was "making her miserable and she was tired of him" was insufficient to make a prima facie case of retaliation absent any indication that plaintiff was complaining about discrimination).

Plaintiff's evidence about her complaints to Ms. Powell and Ms. Pollmiller is similarly flawed. Ms. Powell testified that plaintiff told her that during one productivity meeting with Mr. Knecht, Mr. Knecht "minimized her big time in front of her team" and said "something to effect of she needed a lesson in productivity." There is no evidence providing additional context to this discussion and, thus, no evidence that plaintiff expressed a concern about sex discrimination or a concern that could be construed as a concern about sex discrimination. Plaintiff testified that she told Ms. Powell that Mr. Knecht "got really mad at me and yelled at me" at the December 29, 2016 meeting. At Ms. Powers' suggestion, plaintiff then contacted Julie Pollmiller in Shared

Services.  Plaintiff testified that she told Ms. Pollmiller that Mr. Knect raised his voice and accused her of creating a hostile work environment for her managers and micromanaging her team.  Tenth Circuit precedent establishes that general complaints like the ones made by plaintiff are insufficient to put defendant on notice that she sought to oppose sex discrimination.

The only other complaint identified by plaintiff in the argument section of her submission is one in which she reported to Ms. Hawkins that Amy Milroy, one of plaintiff's direct reports, told her that Lou Gehring, the director of the Shawnee Mission Medical Center Foundation, had raised his voice to Ms. Milroy, waved his finger at her and was incredibly rude to her during a meeting.  According to plaintiff, Ms. Milroy reported that she was offended and scared by Mr. Gehring's behavior and that plaintiff, in turn, reported this behavior to Ms. Hawkins.  But there is no evidence that Ms. Milroy expressed a concern about sex discrimination or otherwise framed her concern in a way that would permit a jury to conclude that Ms. Milroy was complaining about sex discrimination.  Similarly, there is no evidence that plaintiff reported to Ms. Hawkins that Ms. Milroy had felt discriminated against on the basis of sex or that plaintiff was reporting sex discrimination. *See Faragalla v. Douglas County Sch. Dist. RE 1*, 411 Fed. Appx. 140, 148 (10th Cir. Jan. 12, 2011) (plaintiff's complaints about supervisor's "yelling and finger pointing" and her reports about being "intimidated, scrutinized, and verbally attacked at work" did not constitute protected activity where none of the complaints made any reference to plaintiff's race, religion, or national origin, or alleged discrimination or harassment on any unlawful basis).

The parties' submissions reflect two other potential complaints that plaintiff does not address in the argument portion of her brief but are mentioned in the parties' statements of fact and responses thereto.  The first concerns the August 2015 meeting attended by plaintiff and

Karsten Randolph along with Ms. Hawkins, Mr. Knecht and all of plaintiff's direct reports. Plaintiff testified that during the meeting she stated that "the productivity and how it's set up for the NICU at Shawnee Mission was not appropriate and that it really needed to be looked at." According to plaintiff, Mr. Randolph then asked her "in a very rude and derogatory way" whether she had ever worked with Premier Benchmarking and then told her managers "Your boss is going to get a quick lesson on productivity." Later, plaintiff told Ms. Hawkins that she had "never been spoken to" the way that Mr. Randolph spoke to her in the meeting. Nothing in the record suggests that plaintiff complained about sex discrimination or otherwise suggested that defendant, through Mr. Randolph's comments or behavior, was somehow engaged in an unlawful employment practice. The second concerns a reference in the record to a "boys' club atmosphere" at the hospital consisting of Ken Bacon, Karsten Randolph and the finance team at the hospital. Ms. Powers testified that she and other female managers were sometimes frustrated when male leadership went golfing during the work day. Plaintiff testified that Ms. Powers had shared that frustration with her but that plaintiff did not take that information to anyone else. It is clear, then, that plaintiff does not contend that she reported to anyone that a "boys' club atmosphere" existed at the hospital.

Having exhaustively examined all of the evidence referenced by plaintiff in support of her retaliation claims, the court concludes that summary judgment is required on those claims. Each of plaintiff's complaints falls squarely within the types of general complaints about company management considered and rejected by the Tenth Circuit in *Hinds v. Sprint/United Management Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008). Because plaintiff has not come forward with evidence sufficient to show that she conveyed to defendant a concern that defendant had engaged in an

unlawful employment practice or a concern that she had been treated differently based on her sex, she cannot establish a prima facie case of retaliation. Summary judgment is granted in favor of defendant on these claims.[6]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion for summary judgment on all claims (doc. 71) is granted.

**IT IS SO ORDERED.**

Dated this 19th day of September, 2019, at Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

---

[6] In her submissions, plaintiff contends that the behavior of Mr. Knecht, Mr. Gehring and other male members of management toward female managers "suggests stereotyping and creates an inference of sex discrimination." She cites a Ninth Circuit case, *Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061 (9th Cir. 2003), for the principle that "complaints about assertive, strong women who speak up for themselves" and the use of phrases such as "difficult," "negative attitude," "not a team player," and "problematic" are sexual stereotypes that could reveal illegitimate motives. *Stegall* did not address protected activity for purposes of a retaliation claim and, in any event, there is no evidence that plaintiff reported to anyone that any of her supervisors ever used what might be perceived as a sexual stereotype to describe plaintiff or any other female manager.